COMMONWEALTH *vs.* ANTHONY D. MAZZA.

Suffolk.     February 4, 1974. — July 17, 1974.

Present: TAURO, C.J., QUIRICO, BRAUCHER, HENNESSEY, & KAPLAN, JJ.

*Homicide.   Insanity.   Practice, Criminal,* Capital case.

On an appeal from a conviction for murder in the first degree, this court declined to exercise its powers under G. L. c. 278, § 33E, merely because of mental retardation of the defendant not amounting to legal insanity. [32-34]

INDICTMENTS found and returned in the Superior Court on August 11, 1972.

The cases were tried before *Travers, J.*

*Charlotte Anne Perretta* for the defendant.

*Newman A. Flanagan,* Assistant District Attorney, for the Commonwealth.

HENNESSEY, J.   The defendant was indicted for, and convicted of, murder in the first degree and robbery and brings these appeals under G. L. c. 278, §§ 33A-33G. He

argues no assignments of error but urges only that we exercise our powers under § 33E of that chapter and reduce the verdict to a lesser degree of guilt. The sole reason suggested for the invocation of such a procedure is alleged to be the defendant's mental retardation and consequent diminished criminal responsibility. We decline to disturb the verdict of the jury, which was fully warranted on the evidence.

The facts are as follows. On June 30, 1972, at approximately 11:30 A.M., the defendant asked Robert Anderson if he could use Anderson's apartment. That afternoon, Anderson, who had known the defendant for several months, gave the defendant permission to stay there. They then separated and did not spend the evening together. Robert Anderson spent the evening at the movies and the Novelty Bar, which he left at approximately 2 A.M. He then walked home to his apartment, arriving at approximately 2:45 A.M. When he entered the apartment, he went first to the refrigerator, and he then proceeded to his mother's bedroom. When he reached the room, he observed the defendant standing alone beside the dead body of a man. The dead man was lying face up and his pants pockets had been turned inside out. The defendant was wearing leather gloves. Anderson asked the defendant what had happened and was told that the defendant had "had a struggle." The defendant then stated that they should get the body out of the apartment immediately, and he began to tie up the dead man. He asked Anderson to help him and told Anderson not to mention what he had seen or he would be shot "or whatever." Despite Anderson's disagreement, the defendant said he would remove the body from the apartment on the following day, and he gave Anderson a watch, a ring, and a car key. These were shown later to be the property of the dead man. The body was then placed in a closet in the back hallway of the apartment. There was no lock on the closet door at that time. The defendant later bought a lock and installed it on the door.

There was evidence that the defendant used the dead man's credit cards to procure merchandise, and that he

used the dead man's automobile. There was also evidence that the deceased had left a night club on the night of his death, accompanied by another man, whom the jury could find had an appearance consistent with that of the defendant. The victim died of strangulation.

The facts relevant to the claim under § 33E were developed at a pre-trial hearing on the defendant's motion to suppress certain of his statements to police.[1] At that hearing a Dr. Richard A. Pigott testified to the defendant's mental faculties and particularly as to his ability to comprehend the *Miranda* warning read to him by the police before interrogation. Dr. Pigott testified that he had tested the defendant's "general mental ability or intelligence, and ability to understand verbal, auditory material, auditory comprehension." His over-all I. Q. was seventy-seven; the nonverbal component was eighty-eight; and his verbal ability was in the high grade defective range. A test of auditory comprehension indicated an inability to understand material beyond the second-grade level. His handwriting demonstrated functional illiteracy.

An assistant superintendent of the Springfield schools then testified as to the defendant's educational background. After one year in an ordinary first-grade classroom, the defendant was transferred to an ungraded class for mentally handicapped children. Such classes are in two levels, educable and trainable, and the defendant was in the higher, educable classification. Later reports indicated that the defendant had no academic ability and that "[h]e is not vicious, but is a constant source of irritation to his teacher and classmates alike." The defendant left school at the minimum legal age of sixteen. His last report card rated him average on emotional stability.

No attempt was made to introduce any evidence as to the defendant's mental capacity at the time of the trial. It is conceded that the defendant is legally responsible within

---

[1] This motion was allowed and the testimony at the hearing was never presented to the jury at the trial.

the meaning of the two-part test of *Commonwealth* v. *McHoul,* 352 Mass. 544, 546-547 (1967).

While G. L. c. 278, § 33E, gives us power on appeal broader than that of a trial judge on a motion for a new trial, to reduce verdicts or order new trials for any reason that justice may require, *Commonwealth* v. *Baker,* 346 Mass. 107, 109 (1963), we have stated that this power is to be used with restraint. *Commonwealth* v. *Williams,* 364 Mass. 145, 151 (1973). *Commonwealth* v. *Lannon,* 364 Mass. 481, 486 (1974). Heretofore, in acting under § 33E, we have not recognized any claim for relief resembling the defendant's argument in this case. We have afforded relief on various other compelling grounds. Cf. *Commonwealth* v. *Cox,* 327 Mass. 609 (1951) (evidence of insanity); *Commonwealth* v. *Baker,* 346 Mass. 107 (1963) (evidence of self-defence); *Commonwealth* v. *Kendrick,* 351 Mass. 203 (1966) (evidence of self-defence); *Commonwealth* v. *White,* 353 Mass. 409 (1967) (evidence negating the life-felony element of a first degree felony murder conviction); *Commonwealth* v. *McCauley,* 355 Mass. 554 (1969) (possibility of lack of intention); *Commonwealth* v. *Bearse,* 358 Mass. 481 (1970) (unwarranted argument may have influenced the jury); *Commonwealth* v. *Ransom,* 358 Mass. 580 (1971) (evidence of provocation and killing in the heat of passion); *Commonwealth* v. *Kinney,* 361 Mass. 709 (1972) (weight of the evidence); *Commonwealth* v. *Williams,* 364 Mass. 145 (1973) (weight of the evidence).

The defendant here would in a sense have us use § 33E as a vehicle to promulgate the entirely new defence of diminished responsibility based on mental retardation. On the facts of this case, we decline to do so, although we do not state that the mental retardation of a defendant may not be a factor for consideration under § 33E in an appropriate case.

We adhere to the view we expressed in *Commonwealth* v. *Costa,* 360 Mass. 177 (1971), that there is no intermediate stage of partial criminal responsibility between insanity and ordinary responsibility as defined by statute. See also

*Commonwealth* v. *Cooper,* 219 Mass. 1, 4-6 (1914), and *Commonwealth* v. *Lannon,* 364 Mass. 481, 485 (1974). What might be considered to be an exception, viz., that a defendant who was at the time of the crime voluntarily intoxicated to such a degree that he was incapable of deliberate premeditation may not be found guilty of murder in the first degree, *Commonwealth* v. *Delle Chiaie,* 323 Mass. 615 (1949), is not an exception at all. It is merely an application of the ordinary rules of law pertaining to the requisite mental state for conviction of a particular crime charged.

In the present case there was no evidence presented nor have we heard any argument that the defendant was incapable of the necessary intent for conviction of murder in the first degree, either premeditated or committed in the commission of a crime punishable by life imprisonment. On the contrary, there is considerable evidence in the record relative to disposing of the victim's body and the use of his personal property, particularly a car and some credit cards, to demonstrate that the defendant was capable of formulating and carrying out plans.

The record establishes, and the parties have agreed, that the defendant at the time of the crime had the "substantial capacity . . . to appreciate the criminality [wrongfulness] of his conduct . . . [and] to conform his conduct to the requirements of law." See *Commonwealth* v. *McHoul,* 352 Mass. 544, 547 (1967). We do not believe that one who has the capacity required by the test in the *McHoul* case should be relieved of any measure of criminal responsibility merely because his intellectual faculties are subnormal.

In accordance with our duty under G. L. c. 278, § 33E, as amended through St. 1962, c. 453, we have reviewed the entire evidence and are of opinion that justice does not require us either to order a new trial or to direct the entry of a verdict of a lesser degree of guilt.

*Judgments affirmed.*