STATE

v.

**Curley SNELL.**

No. 2003–219–C.A.

Supreme Court of Rhode Island.

Feb. 27, 2006.

**112**

126 (1976). This appeal calls into question the prejudicial effect that a jury's knowledge of a defendant's incarceration may have on the presumption of innocence. Specifically, the defendant, Curley Snell, argues that the trial justice erred in compelling him to stand trial in prison clothing and handcuffs. The defendant also asserts that the trial justice committed reversible error by not permitting him to select his own attorney, in allowing the jury to hear that he had two previous convictions for domestic assault, and in excluding certain medical records.

The defendant appeals from convictions of one count of felony domestic assault (count 1), two counts of assault with a dangerous weapon (counts 2–3), and one count of simple domestic assault after previously having been convicted twice of domestic assault (count 4). On March 22, 2002, defendant was sentenced to a total of forty-five years at the Adult Correctional Institutions (ACI), with thirty years to serve and the rest suspended, with probation. For the reasons set forth herein, we affirm the convictions.

I

**Facts and Procedural History**

The incidents underlying counts 1 through 4 pertain to a January 12, 2001 encounter between defendant and his ex-girlfriend, Tanny Eisom. At trial, Ms. Eisom testified that on the previous evening, as she was leaving her home to attend a birthday celebration with her sister, Dawn McDaniel, and her sister's friend, Tyrone Tillman, defendant arrived at her house to drop off their infant son. Ms. Eisom and Mr. Snell had been involved in a dating relationship that ended in May 2000. According to Ms. Eisom, the two argued about her plans to go out that night. She testified that although her brother, Slade Edmonds, was there to watch the baby,

Aaron Weisman, Esq., for Plaintiff.

Paul Lynch, Esq., for Defendant.

Present: WILLIAMS, C.J., GOLDBERG, FLAHERTY, SUTTELL, and ROBINSON, JJ.

**OPINION**

Justice SUTTELL, for the Court.

Although not expressly articulated in the Constitution, "the presumption of innocence" is a fundamental principle of our criminal jurisprudence, and a "basic component of a fair trial under our system of criminal justice." *Estelle v. Williams,* 425 U.S. 501, 503, 96 S.Ct. 1691, 48 L.Ed.2d

defendant was angry that she was not staying home, and told her, "I'm gonna get you," before she left.

Ms. Eisom further testified that she returned around 2:15 a.m. As she proceeded up the stairs to her second-floor apartment with Ms. McDaniel leading the way, her sister abruptly turned and told Ms. Eisom to run. According to Ms. Eisom, defendant was charging down the stairs at her from above. She fled outside the building, but because of icy conditions and her high-heeled boots, she was unable to run very far down the walkway to get away from defendant. Instead, Ms. Eisom testified, she stopped running, turned to defendant, and asked him not to start any trouble. She said that defendant then grabbed her by the sleeves of her coat near her hands, pulled her forward and struck her a few times in the face and head with a closed fist. Ms. Eisom said that her sister then stepped in and grabbed defendant by the arm, telling him to stop. He did not stop, however, pulling Ms. Eisom's hair, hitting her, and ultimately stabbing her in the back of her neck with a three-inch pocketknife.

According to Ms. Eisom, after she yelled that defendant had stabbed her, both Ms. McDaniel and Mr. Tillman came to her rescue, attempting to pull defendant away from her. Ms. Eisom testified that she fell to the ground and defendant hovered over her, swinging the knife. She started kicking and throwing up her hands to block the knife, while Ms. McDaniel and Mr. Tillman continued to pull defendant back.

Ms. Eisom testified that the next thing she noticed was her brother, Slade Edmonds, coming out of the apartment in his underwear. She testified that after pulling defendant off her, Mr. Edmonds pushed him to the ground, at which time defendant still held the pocketknife in his right hand. Ms. Eisom testified that in the

ensuing tussle, she observed defendant slice Mr. Edmonds across the stomach and stab him in the neck. Ms. Eisom testified that Mr. Edmonds fell to the ground after the stabbing, hitting his head on the steps near the entryway. She testified that defendant then proceeded to kick and stomp on Mr. Edmonds's head and face with his boots before walking away and fleeing the scene.

Slade Edmonds also testified. He stated that he awoke at approximately 2 a.m. to the screams of his sisters and rushed outside in his underwear to confront defendant. Mr. Edmonds testified that when he got out into the icy cold night and saw Ms. Eisom on the ground, he grabbed defendant by his leather jacket and asked him what he was doing. Mr. Edmonds testified that he had no memory of what transpired between asking defendant what he was doing and waking up in the hospital. Mr. Edmonds stated that he required stitches on his neck and abdomen and suffered a fractured cheekbone and eye socket. He subsequently underwent surgery on his eye socket as a result of the incident.

After Mr. Edmonds testified, the state and defendant stipulated that defendant had been convicted twice previously of domestic violence crimes. The trial justice explained the relevance of the stipulation to the jurors, cautioning them that they were not to consider the previous convictions as evidence that defendant had a propensity to commit the charged offenses. Rather, the trial justice made clear that the stipulation was in evidence solely to establish an essential element of count 4, that defendant had been convicted twice previously of domestic violence crimes. Although the jury was to accept this element of count 4 as conclusively proven beyond a reasonable doubt, it was to con-

sider the previous convictions for no other purpose.

The jury also heard testimony from Tyrone Tillman, who corroborated much of Ms. Eisom's account of the incident, from a police officer, and from a physician who had treated both Ms. Eisom and Mr. Edmonds. After the prosecution rested, defendant attempted to introduce into evidence four photographs and medical records concerning treatment he received for gunshot wounds to his chest and left hand in 2000. The trial justice admitted the photographs, but excluded the medical records on relevancy grounds. Mr. Snell presented no witnesses in his defense.

After the trial justice gave his instructions, the jury returned a guilty verdict on all counts. Thereafter, defendant made a motion for a new trial under Rule 33 of the Superior Court Rules of Criminal Procedure. At a hearing on February 8, 2002, defendant argued not only that the verdict was against the weight of the evidence, but also that he was entitled to a new trial because he had been in handcuffs and shackles during the trial. Conceding that he was "not allowed to argue errors of law" at a hearing on a motion for a new trial, defendant nevertheless suggested that the constitutional deprivation was so serious that the trial justice should stay sentencing pending defendant's filing a petition for writ of certiorari with the Supreme Court. The trial justice rejected defendant's arguments, and, finding that "the evidence was absolutely overwhelming of this defendant's guilt on each of these counts," he denied the motion for a new trial.

Before defendant was sentenced, he filed a petition for writ of habeas corpus and a motion to stay his sentencing in this Court, both of which were denied. After he was sentenced, he filed a timely notice of appeal. Although initially assigned to the show-cause calendar, we subsequently granted defendant's motion to remove the case from said calendar and to assign it to the regular calendar for full briefing and argument.

## II

### Defendant's Appearance in Prison Attire

After the jury was selected and sworn, but before opening statements, the trial justice gave preliminary instructions to the jury. In discussing the state's burden of proving defendant's guilt beyond a reasonable doubt, he advised:

"You may have observed that the defendant in this case is in the custody of the State marshal. I specifically caution you that this fact is not at all germane or important to your task in determining the defendant's guilt or innocence."

"Also in no way does this defendant's detention diminish or effect his guaranteed presumption of innocence. The mere fact that the defendant is being detained must not prejudice you against him in any way nor should it generate any sympathy for him. It should be regarded by you as a neutral fact and you should give it no weight whatsoever."

Arguing that this cautionary instruction was not sufficient, defendant moved to pass the case because the clothing he was wearing, "prison attire with his name being emblazoned on a tag on a T-shirt and jeans," was inherently prejudicial and could deny him a fair trial. The trial justice denied the motion, noting that defendant had ample notice of the trial date and could have made arrangements to obtain "civilian garb." The trial justice also opined that members of defendant's family, who not only were in court, but also "were in a position to retain private coun-

sel" for defendant, had the means to provide non-prison clothing for him.

■ Although we are asked to review the denial of a motion to pass the case, we will not employ the regular deferential standard of review. *See State v. Lynch*, 854 A.2d 1022, 1033 (R.I.2004) ("A trial justice's decision to deny a motion for a mistrial is accorded great weight and will not be disturbed on appeal unless it is clearly wrong."). Instead, with respect to questions of law and mixed questions of law and fact involving constitutional issues, such as the issue at hand, this Court engages in a *de novo* review. *State v. Campbell*, 691 A.2d 564, 569 (R.I.1997); *accord Ornelas v. United States*, 517 U.S. 690, 697, 116 S.Ct. 1657, 134 L.Ed.2d 911 (1996). We therefore review this matter *de novo*.

■ The right to a fair trial by an impartial jury is guaranteed by the Sixth Amendment to the United States Constitution, applicable to the states through the Due Process Clause of the Fourteenth Amendment, and by article 1, section 10, of the Rhode Island Constitution. *State v. Ordway*, 619 A.2d 819, 826 (R.I.1992); *see* U.S. Const. Amend. VI, XIV; R.I. Const. art. 1, sec. 10. As noted above, "[t]he presumption of innocence, although not articulated in the Constitution, is a basic component of a fair trial under our system of criminal justice." *Estelle*, 425 U.S. at 503, 96 S.Ct. 1691. Thus, courts are under a duty to apply "close judicial scrutiny" to evaluate the likely effects of particular procedures that may diminish a defendant's presumption of innocence. *Id.* at 504, 96 S.Ct. 1691.

■ This Court previously has recognized that knowledge of a defendant's incarceration may have a serious prejudicial effect on the presumption of innocence. *See, e.g., State v. Martinez*, 624 A.2d 291,

294 (R.I.1993); *State v. Burke*, 529 A.2d 621, 628 (R.I.1987). "The prejudicial effect that may arise from the jury's knowledge of a defendant's incarceration results from the likelihood that the jury will infer that the defendant is incarcerated as a result of previous criminal activity and is thus possessed of a general criminal disposition." *Burke*, 529 A.2d at 628. Consequently, the state may not compel an accused to stand trial before a jury while dressed in identifiable prison clothing. *Estelle*, 425 U.S. at 512, 96 S.Ct. 1691. To do so may impinge upon the defendant's presumption of innocence and, therefore, constitute a violation of his or her constitutional right to a fair trial. *See id.* at 503–04, 96 S.Ct. 1691.

■ In determining whether a defendant's appearance in prison attire before a jury was a constitutional violation, the focus is on whether the defendant was truly *compelled* to wear the prison clothing. The United States Supreme Court has held that "the failure to make an objection to the court as to being tried in such clothes, for whatever reason, is sufficient to negate the presence of compulsion necessary to establish a constitutional violation." *Estelle*, 425 U.S. at 512–13, 96 S.Ct. 1691. The reason for the focus on compulsion is that instances often may arise when a defendant prefers to stand trial before the jury in prison clothes in an effort to elicit sympathy. *Id.* at 507–08, 96 S.Ct. 1691. Thus, a criminal defendant dressed in prison attire who does not object so as to invoke that right waives it, "just as he must invoke or abandon other rights." *Id.* at 508, 96 S.Ct. 1691.

Although we have not spoken directly on the issue of a defendant standing trial in prison clothing, this Court has addressed claims of error when trial justices verbally have informed the jury of a defendant's incarceration. For instance, in *Burke*, 529 A.2d at 626–27, one of the defendants al-

leged that the trial justice erred in denying his motion *in limine* to preclude reference to the fact that he was incarcerated at the ACI. The defendant made the motion to preclude the testimony of a witness, also incarcerated at the ACI, who would testify about certain statements that the defendant allegedly made to him while in the ACI. *Id.* at 627. Although the trial justice failed to issue the cautionary instruction that the defendant requested, we held that the issue had been waived because the defendant's counsel failed to object at trial. *Id.*

Similarly, in *State v. Fenner*, 503 A.2d 518, 522 (R.I.1986), this Court acknowledged that it is the obligation of defense counsel to raise an objection at the appropriate time. In *Fenner*, before jury selection, the trial justice informed counsel that she would disclose to the jury that the defendant was in custody, to which defense counsel raised no objection. *Id.* at 521. Nor did counsel object when the trial justice gave the jury a cautionary instruction similar to the one given in the present case. *Id.* Later in the *Fenner* trial, following an afternoon recess, defense counsel did raise an objection to the trial justice's earlier statement and requested that she pass the case based on prejudicial error. *Id.* The trial justice refused and we affirmed. *Id.* at 521–22.

Although the situation in *Fenner* differs from the situation in the present case, this Court's words in *Fenner* are informative with regard to the timing of the necessary objection. We said that in the future, when defense counsel wishes to object to the trial justice's intention to inform the jury of the defendant's incarceration, he or she must do so *before* the trial justice so informs the jury, not afterward. *Fenner*, 503 A.2d at 522. In addition, we recognized that a trial justice's reference to a defendant's incarceration may not be re-versible error when a cautionary instruction is sufficient to negate any potential prejudice. *Id.* In so holding, we acknowledged that our criminal justice system necessarily depends upon the proposition that jurors will obey cautionary instructions and apply the law as given to them by the trial justice. *Id.*

Although this Court previously has not had occasion to address the precise issue of prison clothing, we infer from the holdings in both *Burke* and *Fenner* that an objection is timely if made before any prejudice can emanate from a defendant's appearance in prison garb. Such a conclusion also comports with the holding of the United States Supreme Court in *Estelle:*

"[A]lthough the State cannot, consistently with the Fourteenth Amendment, compel an accused to stand trial before a jury while dressed in identifiable prison clothes, the failure to make an objection to the court as to being tried in such clothes, for whatever reason, is sufficient to negate the presence of compulsion necessary to establish a constitutional violation." *Estelle*, 425 U.S. at 512–13, 96 S.Ct. 1691.

As Chief Justice Burger noted, a defendant's "silence precludes any suggestion of compulsion." *Id.* at 512 n.9, 96 S.Ct. 1691.

We are of the opinion, therefore, that Mr. Snell's objection to his prison attire was untimely. Defense counsel did not raise the objection to Mr. Snell's clothing until after the jury was selected and sworn, and after the trial justice gave preliminary instructions. The request to procure alternative clothing was made clearly beyond such time as defendant reasonably became aware of the possible prejudice. The jury panel, including those jurors selected, already had observed defendant in his so-called prison garb for quite some time when the objection was finally made.

In the case under review, knowledge of defendant's incarceration was not initially imparted by the trial justice in his preliminary instructions. Rather, the jurors first were made aware of his incarceration by their observation of him in prison clothing throughout the *voir dire* process and during the trial justice's introductory remarks. It is clear from the record that defendant had addressed several motions to the trial justice before a jury panel was brought into the courtroom. If he had any concerns about the jurors seeing him in prison clothing, he could have presented them to the court at that time. In these circumstances, we cannot say that defendant was compelled to be tried in prison clothes in violation of his constitutional rights pursuant to *Estelle*.

█ Moreover, we are satisfied under these circumstances that the trial justice's cautionary instruction that the jury was not to give any weight to the fact that defendant was in custody was not only appropriate, but also sufficient to negate any potential prejudice.

## III

### Defendant's Appearance in Handcuffs

We reach a similar conclusion in defendant's related argument that the trial justice committed reversible error in compelling Mr. Snell to stand trial in shackles or handcuffs. The defendant concedes, as he must, that he did not specifically object to his appearance before the jury in handcuffs. Indeed, the record of the trial itself is totally barren of any reference to handcuffs, leg irons, shackles, or restraints of any sort. On appeal, defendant asserts that his objection to prison clothing was sufficient to encompass any prejudice

caused by "being forced to stand trial while branded with an unmistakable mark of guilt." Mr. Snell did raise the issue in a post-trial motion for a new trial, but as his counsel acknowledged at the hearing on said motion, an alleged error of law is not a proper basis for relief under Rule 33.[1]

█ Handcuffing a defendant is treated differently from prison attire "because the former provides courtroom security while the latter does not." *State v. Correra*, 430 A.2d 1251, 1256 (R.I.1981). "The law has long forbidden routine use of visible shackles during the guilt phase; it permits a State to shackle a criminal defendant only in the presence of a special need." *Deck v. Missouri*, 544 U.S. 622, ——, 125 S.Ct. 2007, 2010, 161 L.Ed.2d 953 (2005). The reasoning for this rule is that shackling may diminish the defendant's presumption of innocence, prevent him from participating in his own defense, and undercut the trial justice's desire to maintain dignity in the courtroom. *Id.* at 2013. However, there are cases in which these perils of restraining a defendant are "unavoidable." *Id.* at 2014. Trial courts are thus given latitude to make individualized determinations about whether such security measures are necessary. *See id.* A trial justice may compel a defendant to appear before the jury in restraints if justified "by essential state interests such as physical security, escape prevention, or courtroom decorum." *Id.* at 2012.

In contexts analogous to the one here, this Court has followed the United States Supreme Court's recognition that "binding and gagging might possibly be the fairest and most reasonable way to handle" a particularly disruptive defendant. *Illinois v. Allen*, 397 U.S. 337, 344, 90 S.Ct. 1057,

---

1. We pause to note that Rule 33 of the Superior Court Rules of Criminal Procedure was amended on July 1, 2002, to permit the court to order a new trial for error of law committed at trial. *See* Advisory Committee Notes to Rule 33 (2002 Amendment).

25 L.Ed.2d 353 (1970). For example, in *State v. Thornton*, 800 A.2d 1016, 1032–33 (R.I.2002), this Court held that the trial justice did not abuse his discretion in deciding that safety precautions were necessary to restrain the defendant during sidebar conferences at his trial. Noting that the defendant had a past criminal record including forty-two criminal charges and had been disruptive in court by interrupting and making sarcastic remarks, we held that the trial justice's order that the defendant was to appear at sidebar only if handcuffed did not violate his constitutional rights. *Id.* at 1032 n.18, 1036. We indicated that the trial justice was correct in considering the severity of the crimes charged, the defendant's past criminal record, and his disruptive conduct and sarcastic demeanor in court in making the discretionary ruling on the need for handcuffs. *Id.* at 1032.

 Similarly, in *Correra*, 430 A.2d at 1256, although faced with the different question of the appropriateness of a witness appearing before the jury in handcuffs, we stated that the trial justice had a duty to shackle a witness if necessary to prevent escape, minimize danger, or maintain order in the courtroom. Although

defense counsel had asked for the record to reflect that the witness appeared in handcuffs, we concluded that because he failed to specifically object, he did not preserve the issue for appeal. *Id.* at 1257. Moreover, we held that although shackling should be avoided if possible, witnesses whose records demonstrate that they are a threat to courtroom safety warrant restraint. *Id.* at 1256. Clearly, the same applies to a defendant whose record or conduct is likely to suggest a threat to courtroom safety and decorum.[2]

 In the present case, although Mr. Snell raised the issue of handcuffs in a motion for a new trial, he failed to raise any objection during trial and there is no record proof that he was in the courtroom in restraints of any sort.[3] Even if we were to conclude that the objection to his prison clothing sufficed to preserve the shackling issue, such objection was not timely made. The defendant therefore is unable to demonstrate the compulsion that is necessary to establish a constitutional claim.

 Moreover, in denying defendant's motion for a new trial, the trial justice gave adequate reasons for restraining Mr. Snell. The trial justice said that

---

**2.** While less restrictive measures for ensuring courtroom security is a natural consideration to be taken into account with other circumstances of each particular case, we need not address the extent of the inquiry that is necessary when deciding whether to shackle a defendant. *See Woodard v. Perrin*, 692 F.2d 220, 221 n. 1 (1st Cir.1982) (declining to interpret the United States Supreme Court's language in *Illinois v. Allen*, 397 U.S. 337, 344, 90 S.Ct. 1057, 25 L.Ed.2d 353 (1970) ("[N]o person should be tried while shackled and gagged except as a last resort."), as meaning that less restrictive measures always had to be explored and employed). The United States Court of Appeals for the First Circuit has stated that "a judge *should* consider less restrictive measures before deciding that a defendant should be shackled." *Woodard*, 692 F.2d at 221. (Emphasis added.) However,

that court also stressed that whether less restrictive measures exist is not always controlling, because if such an intense inquiry into that question was required in every case, "no defendant could be tried while shackled, because he could always be removed from the courtroom instead." *Id.* at 221 n.1.

**3.** The defendant contends that the record shows that the issue was raised at some point during trial, based on the trial justice's statement during the motion for a new trial hearing that no objection to either the handcuffs or prison attire ever was made "until after the trial commenced with jury selection." Still, no reference to defendant's so-called shackles appears anywhere in the transcripts of the trial itself.

he was disruptive during his trial, speaking out-of-turn, making sarcastic faces, snickering, and laughing out loud while witnesses were testifying, despite being cautioned on several occasions. The trial record supports this assertion. The trial justice also noted that Mr. Snell was on trial for a serious criminal charge, was a high security inmate at the ACI, and had a history of violence. Clearly, these considerations warranted the trial justice's concern for courtroom safety and decorum. Based on these factors, even if defendant had objected to his appearance in handcuffs, we are satisfied that the trial justice had adequate reasons for restraining him to protect the courtroom from disruption and danger. *See Thornton,* 800 A.2d at 1032. Moreover, the cautionary instruction given to the jurors, that they were not to consider defendant's detention for any purpose, was sufficient to negate the possibility of prejudice. Accordingly, we decline to overturn defendant's convictions on these grounds.

## IV

### Defendant's Right to Select His Own Attorney

It appears from the record that on December 5, 2001, five days before the trial began, defendant sought to discharge his court-appointed attorney. His pretrial motion to remove his counsel was denied. When the case was reached for trial on December 10, 2001, defendant pressed a similar motion, which was held to be "moot" because the previous denial was the law of the case. Then, after a jury panel had entered the courtroom, defendant's counsel advised the trial justice at a sidebar conference that members of defen-

dant's family had informed him that they had retained private counsel, and that he had been "fired" as defendant's attorney. The trial justice then excused the jury and asked defendant whether he was prepared to proceed *pro se.* Mr. Snell responded that he did not wish to represent himself, but alleged that his current counsel was ineffective.

The trial justice noted that defendant had an opportunity to obtain new counsel since his motion was denied on December 5 and that the private attorney his family purportedly engaged was not present in the courtroom. He then rejected "this 11th hour request, you can call it, I guess the 12th hour, because the jury walked in the room," and said, "[t]here is no doubt in this Court's mind, Mr. Snell, all of this is to obtain a continuance of the trial in this matter."

■ Although defendant insisted that he was not seeking a continuance, we conclude otherwise. He clearly stated that he did not wish to represent himself, yet no private counsel was prepared to proceed on his behalf when he made the request.[4] Moreover, it seems clear from the transcript that defendant was primarily concerned that he was not ready for trial. At one point he said, "I'm not asking for a continuance. What I am asking for is knowledge to know if this was put in for a speedy trial." Therefore, we will treat this as the denial of a request for a continuance to secure alternative counsel, just as the trial justice did. *See State v. Burke,* 811 A.2d 1158, 1163 (R.I.2002) (holding that although the defendant made neither a motion to substitute counsel nor for a continuance, we would treat the case as if

4. Later in the trial, the trial justice said that private counsel had appeared in his chambers to indicate that defendant's family had contacted him, and that he was going to enter his appearance, having been told that it was for a pretrial conference, but did not do so when he learned that the matter had been reached for trial.

such motions had been made because it was clear from the trial justice's ruling that such motions would have been denied).

It is well settled that the decision whether to grant a defendant's request for a continuance to secure alternative counsel lies within the sound discretion of the trial justice. *State v. Ashness*, 461 A.2d 659, 663 (R.I.1983). In exercising that discretion, "the trial justice must weigh the interest of the defendant in securing counsel of his choice against the interest of the public in an efficient and effective judicial system." *Id.* at 663–64. Whether the trial justice's denial was so arbitrary as to constitute a violation of due process "depends upon the particular circumstances of each case and the reason asserted for the request." *Id.* at 664.

"Some of the factors to be weighed in the balance include the promptness of the continuance motion and the length of time requested; the age and intricacy of the case; the inconvenience to the parties, witnesses, jurors, counsel, and the court; whether the request appears to be legitimate or merely contrived foot dragging; whether the defendant contributed to the circumstances giving rise to the request; whether the defendant in fact has other competent and prepared trial counsel ready to pinch-hit; whether there are multiple codefendants, making calendar control more difficult than usual; and any other relevant factor made manifest by the record." *State v. Moran*, 699 A.2d 20, 26 (R.I. 1997).

Although we have recognized that a criminal defendant has the right to obtain counsel of his or her choice, *State v. Dias*, 118 R.I. 499, 502, 374 A.2d 1028, 1029 (1977), "[j]udges must be vigilant that requests for appointment of a new attor-

ney on the eve of trial should not become a vehicle for delay." *State v. Monteiro*, 108 R.I. 569, 576, 277 A.2d 739, 743 (1971). Accordingly, it has been said that "[a]n accused's right to choose his own counsel cannot be manipulated to delay proceedings or hamper the prosecution." *United States v. Panzardi Alvarez*, 816 F.2d 813, 816 (1st Cir.1987). Consequently, the United States Court of Appeals for the First Circuit has held that "[w]hen a defendant attempts to substitute counsel at the eleventh hour or in mid-trial, he must show good cause such as a conflict of interest, a breakdown in communication or an irreconcilable dispute with his attorney." *Id.* This Court similarly has stated that "to work a delay by a last minute discharge of counsel, there must exist exceptional circumstances * * *." *Monteiro*, 108 R.I. at 575, 277 A.2d at 742.

In the present case, the trial justice did not abuse his discretion in deciding that, although defendant had a right to his counsel of choice, he had no right to obtain a continuance for that reason. Applying the above-listed factors from *Moran*, we are persuaded that the trial justice did not act arbitrarily when he denied Mr. Snell's motions for appointment of counsel and refused his attempts to discharge his court-appointed lawyer. The trial justice was indeed warranted in his assessment that this was simply a last-minute attempt to delay the trial. The case had been ready for trial since November 19, 2001, and had been assigned to a specific trial date for at least five days. The state was ready to proceed and noted the inconvenience and emotional turmoil that a continuance would have caused its witnesses. The new private attorney Mr. Snell wished to procure was not present in the courtroom and had not entered an appearance on his behalf. Also, defendant's main concern once his motion for new counsel was

denied was whether a motion for a speedy trial had been filed on his behalf, because he alleged he was not ready to proceed.

These circumstances, taken together, indicate that the present case is one in which the purported interest of the defendant in securing counsel of his choice was outweighed by the interest of the public in an efficient and effective judicial system. *See Ashness*, 461 A.2d at 663–64. No exceptional circumstances were present to constitute good cause for Mr. Snell to discharge his lawyer, and we agree with the trial justice that his "11th hour" request to obtain new counsel when the jury was already entering the courtroom was nothing but a last-ditch attempt to delay his trial. Therefore, we hold that the trial justice did not abuse his discretion in denying defendant's attempt to secure new counsel, and we will not overturn the convictions on that ground.

## V

### Exclusion of Defendant's Medical Records

At the conclusion of the state's case, the trial justice asked defense counsel whether he was going "to present a defense," to which counsel replied "I had essentially two exhibits * * * and that's it for the defense." After an untranscribed bench conference, the court recessed for lunch. One of the exhibits that defendant sought to introduce consisted of various records of Rhode Island Hospital pertaining to the medical treatment of defendant for gunshot wounds to his chest and left hand in August 2000.

After reviewing the medical records during the lunch break, the trial justice excluded them from the evidence on the grounds that they had no relevance to the case, and, even if they did, any probative value "would be outweighed by the confu-

sion to the jury." The defendant then immediately rested, making no offer of proof on the record and presenting no witnesses. On appeal, however, defendant asserts that the hospital records were indeed relevant, if not crucial, to his defense that "given the nature of the injuries to his left hand, he was physically incapable of administering the assaults described by Tanny Eisom and Slade Edmonds." He maintains, therefore, that the trial justice abused his discretion by excluding them.

■■■■■■ "Determinations of the relevancy of evidence offered at trial are within the sound discretion of the trial justice." *State v. Marini*, 638 A.2d 507, 516 (R.I. 1994). "The exclusion of evidence on grounds of relevancy does not constitute reversible error unless the trial justice (1) abused his or her discretion, and (2) thereby caused substantial injury to the party seeking admission of such evidence." *State v. Calitri*, 459 A.2d 478, 480 (R.I. 1983). With respect to the "substantial injury" inquiry, the question to be addressed is "whether the rejected evidence reasonably could have altered the result." *State v. Burke*, 522 A.2d 725, 730 (R.I. 1987). "Proffered evidence is considered probative and relevant 'when it renders the existence of the fact sought to be proven more or less probable than it would have been without the evidence.'" *State v. Wilding*, 740 A.2d 1235, 1242 (R.I.1999) (quoting *State v. Kaner*, 463 A.2d 1348, 1351 (R.I.1983)); *see also* R.I.R. Evid. 401.

We are well satisfied that the trial justice did not abuse his discretion in excluding the medical records. Rather, we believe he undertook a thoughtful examination of the proffered evidence and determined that the medical records had no relevance, and moreover probably would confuse the jury. It is apparent that the trial justice was presented with more than fifty pages of emergency-room rec-

ords, consultation reports, progress notes, and other hospital records, most of which were handwritten. The trial justice reviewed the records over the lunch recess, then stated on the record that the records pertained to medical treatment given to Mr. Snell from August 2000 to October 11, 2000, for gunshot wounds to his chest and left hand, apparently suffered in a drive-by shooting. The trial justice further noted that the medical records indicate that during surgery to defendant's left hand "some kind of device" was left in his hand that later was removed. He also found that the hospital reported that defendant was doing well, had no complaints, and had missed two follow-up visits. We perceive no abuse of discretion in the trial justice's ruling.

We also are satisfied that the trial justice was acting within his discretion in ruling that, even if defendant's medical records did have any probative value, it was outweighed by the possibility of confusing the jury. "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." R.I.R. Evid. 403. Like the question of relevance, "[t]he ultimate determination [under Rule 403] of the effect of * * * evidence is within the trial justice's discretion." *State v. Grundy*, 582 A.2d 1166, 1172 (R.I.1990). Here, the admission of more than fifty pages of hospital records, mostly handwritten, pertaining to injuries suffered in an unrelated drive-by shooting some five months before the commission of the charged offenses might well have confused the jury. For all the foregoing reasons, we hold that the trial justice did not abuse his discretion by excluding the admission of the proffered hospital records as full exhibits.[5]

## VI

### Admission of Defendant's Previous Convictions for Domestic Violence

The defendant's final contention on appeal is that the trial justice abused his discretion in permitting the jury to hear that he had been convicted twice previously of domestic assault, and then exacerbated the error by instructing the jury that one of the elements of the offense charged in count 4 was that defendant had two previous domestic assault convictions. During the trial, both parties stipulated that defendant had been "twice previously convicted of a domestic violence crime." The trial justice then immediately instructed the jury that the stipulation was being offered to satisfy one of the elements of count 4, and that it was bound to accept the stipulation as conclusive proof of the facts so stipulated. He further instructed the jury that it could consider the stipulation only to satisfy the element of two previous convictions, and for no other purpose.[6]

---

5. We pause to note that these medical records likewise could have been excluded based on a lack of foundation. Under Rule 803(6) of the Rhode Island Rules of Evidence, a record such as the one offered in this case qualifies for admissibility as an exception to the hearsay rule only if a foundation is laid by testimony of a custodian of the records or other qualified witness that the record was made at or near the time of the event, was kept in the course of a regularly conducted business activity, and it was the regular practice of the business to keep such records. In Mr. Snell's case, no testimony was offered to establish that the criteria for admissibility set forth in Rule 803(6) had been satisfied.

6. The trial justice instructed the jury as follows:

In the defendant's brief, however, he concedes that this issue is not properly before this Court because he did not raise it at trial. We agree. Under this Court's well established "raise or waive" rule, "an issue that has not been raised and articulated previously at trial is not properly preserved for appellate review." *State v. Gomez*, 848 A.2d 221, 237 (R.I.2004) (quoting *State v. Donato*, 592 A.2d 140, 141 (R.I.1991)). Alleged errors at trial that were not brought to the attention of the trial justice will not be disturbed unless "basic constitutional rights are concerned." *Donato*, 592 A.2d at 141. In the present case, not only did the defendant fail to raise an objection to his previous convictions being admitted to establish an element of simple assault, but he also, in fact, stipulated to their admission. Although the defendant did object when the state attempted to admit Ms. Eisom's testimony about the two previous assaults, his objection was sustained and the jury was prevented from hearing her account of the two previous incidents. *See* R.I.R. Evid. 404(b). However, the defendant later stipulated that the convictions did, in fact, occur and raised no objection to the jury instructions in this regard. Under these circumstances, based on our raise or waive rule, we decline to review the trial justice's admission of the stipulation concerning the defendant's two previous convictions. Having not raised it at trial, the defendant has waived the issue. We need not address, therefore, the trial justice's instructions regarding the convictions and the limited purpose for which the jury might have considered them.

### Conclusion

For the reasons stated herein, we affirm the judgment of the Superior Court. The record shall be remanded to the Superior Court.

---

"THE COURT: Ladies and gentlemen, that means, a stipulation of fact means that both the State and the defendant have agreed that this fact is true and therefore you are bound to accept it as being proven and as being true and that is that Mr. Snell has been twice convicted for domestic violence offenses, once on February 5th, 1996 and the second time on December 6th of the Year 2000. The purpose of this evidence is to satisfy the elements of proof. * * * In this the defendant is charged with on or about the 12th day of January, 2001 in the City of Providence did assault Tanny Eisom after having been previously convicted twice of domestic assault on the 5th of February, 1996 and the 6th of December, 2000 in violation of Rhode Island General Laws. So as I say, this stipulation is being offered to prove, to satisfy the requirement that the State prove the element, one of the elements of this offense beyond a reasonable doubt and that is * * * that Mr. Snell has been previously convicted twice of domestic assault on the 5th of February, 1996 and the 6th of December 2000."

"You are to consider it for [no] other purpose you are not to consider it as evidence of the fact so-called propensity evidence, that is if an individual has committed one or more prior offenses then you can consider it evidence that he has committed an offense for which he is charged. You cannot consider it for that purpose. You can consider that stipulation for satisfying the element of that offense, Count 4 * * *."